**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

JW & JJ ENTERTAINMENT, LLC et al.,

     Plaintiffs,

     v.                                Civil Action No. 8:13-cv-01609-AW

MARK SANDLER,

     Defendant.

<u>**AMENDED MEMORANDUM OPINION**</u>

Plaintiffs have filed a Complaint for Declaratory Judgment and Preliminary and Permanent Injunctive Relief ("Complaint"). Plaintiffs' Complaint involves a contract dispute. Defendant has filed a Motion to Dismiss. The Court has reviewed the record and deems a hearing unnecessary. For the following reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion to Dismiss.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are an assemblage of individuals and corporate entities who are movie producers. Plaintiffs are in the process of producing a movie based on the life story of boxer Roberto Durán Samaniego ("Roberto Duran" or "Duran"). Plaintiffs plead that Duran is widely regarded as one of the greatest boxers of all time. Defendant Mark Sandler ("Sandler" or "Defendant") is an individual who lives in Maryland. Basically, Plaintiffs allege that Sandler has indicated that he will sue them if they make their movie without paying him.

The dispute has its origins in a business relationship gone awry between Sandler and Duran. On February 12, 1995, Sandler, Duran, and Duran's wife, Felicida Durán, entered into a

1

management contract ("Sandler-Duran Agreement" or "Agreement"). The Agreement generally provides that Sandler would manage all of Duran's business affairs and that, to effectuate these purposes, Duran would grant Sandler certain rights.

Section 5 of the Agreement contains one such grant. As the dispute centers on the meaning and effect of Section 5, the Court reproduces it in its entirety:

> Duran grants to Sandler the exclusive right worldwide to use the name "Roberto Duran" or any form thereof and any image or likeness of Duran in any form whether photographic, electronic, videotape, audio or audio tape, literary, news clipping, magazine or otherwise for whatever purpose Sandler deems appropriate. Duran warrants that Sandler has exclusive rights to the Duran name, image, and likeness and that he has given and will give no other party said property. Duran expressly gives to Sandler the rights to Duran's life story and understands that Duran's life story may be documented in book, movie and/or television form. Duran will cooperative [sic] with Sandler to create Duran's life story.

Doc. No. 7-6 § 5, at 3.

Sandler asserts that Duran breached the Agreement. Sandler further states that, after giving Duran notice and an opportunity to cure, he terminated the Agreement and reserved all of his rights under it. Section 15 of the Agreement states that Sandler could terminate it if Duran breached it and that Sandler would retain all rights under it if he elected to terminate it based on Duran's breach. *See id.* § 15, at 6.

After Duran's alleged breach, Sandler states that he sued Duran and his wife in the Circuit Court for Montgomery County, Maryland. Although "Duran Enterprises, LLC" was the plaintiff in that suit, Sandler asserts that Duran assigned all of his rights under the Agreement to

Duran Enterprises pursuant to a term of the Agreement. On February 19, 1997, a default judgment was entered in favor of Duran Enterprises against Duran and his wife in the amount of $356,390.19. Doc. No. 7-10.

Plaintiffs allege that, in March 2007, Duran and a company named Compadre, LLC entered into a contract pursuant to which Duran purported to grant certain rights to Compadre, including his "exclusive life story rights." Doc. No. 1 ¶ 12; *see also* Doc. No. 1-2 at 2–3. Allegedly, through a series of transactions whose details are irrelevant here, Duran's life story rights were transferred to Plaintiffs. *See generally* Doc. No. 1 ¶¶ 13–28. Pursuant to some of these transactions, Plaintiffs allege that, starting in 2009, they have been working diligently to make a movie based on Duran's life story, the working title of which is "Hands of Stone." Plaintiffs add that they have paid hundreds of thousands of dollars for the rights to make Hands of Stone and have incurred millions of dollars in production costs. *See id.* ¶¶ 26, 28.

In October 2012, Sandler allegedly spoke with Plaintiff Weisleder by telephone and told him that he owns the rights to Duran's life story. Plaintiffs generally allege that Sandler has stated that he will sue them unless Plaintiffs pay him a certain amount of money.

On June 4, 2013, Plaintiffs filed a Complaint based on the foregoing allegations. Plaintiffs allege that the Court has both diversity and federal question jurisdiction over the case. Federal question jurisdiction allegedly arises from a First Amendment challenge that Plaintiffs would make if Sandler asserted his rights to Duran's life story pursuant to the Sandler-Duran Agreement. Under Count I, Plaintiffs request a judgment declaring that:

      i.      Defendant has no right to interfere with the production and marketing of Hands of Stone;

      ii.      Defendant does not have a viable cause of action against Plaintiffs;

        iii.     The Sandler-Duran Agreement is void for vagueness;

        iv.     The Sandler-Duran Agreement is an illegal contract of adhesion;

        v.     Duran did not breach the Sandler-Duran Agreement by purporting to assign his life story rights to Plaintiffs;

        vi.     Defendant cannot state a claim for tortious interference with contract;

        vii.     The First Amendment would bar Sandler's claims.

Doc. No. 1 ¶ 50, at 13–15. For its part, Count II contains a request for preliminary and permanent injunctive relief. *Id.* ¶¶ 51–52.

On July 19, 2013, Defendant filed a Motion to Dismiss with Prejudice or, in the Alternative, for Complete or Partial Summary Judgment ("Motion to Dismiss"). Doc. No. 7. Defendant asserts that the Agreement gives him exclusive rights to Duran's life story and argues that Plaintiffs' claims are therefore unfounded. Defendant also raises a res judicata argument based on the state court litigation. Plaintiffs filed their Opposition on August 23, 2013. Doc. No. 10. Plaintiffs more or less make the same arguments that they allege under Count I of their Complaint. Defendant has filed a Reply. Doc. No. 11.

## II.    STANDARD OF REVIEW

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). In two recent cases, the U.S. Supreme Court has clarified the standard applicable to Rule 12(b)(6) motions. *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). These cases make clear that Rule 8 "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Twombly*, 550 U.S. at 556 n.3 (quoting Fed. R. Civ. P. 8(a)(2)). This

showing must consist of at least "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

In deciding a motion to dismiss, the court should first review the complaint to determine which pleadings are entitled to the assumption of truth. *See Iqbal*, 129 S. Ct. at 1949–50. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950. In so doing, the court must construe all factual allegations in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999). The Court need not, however, accept unsupported legal allegations, *Revene v. Charles County Commissioners*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).[1]

## III. LEGAL ANALYSIS

### A. Federal Jurisdictional Question

Plaintiffs assert that the Court has both federal question and diversity jurisdiction over their claims. Plaintiffs ground this assertion on a First Amendment argument. The essence of this argument is that the Court would violate their First Amendment rights by enforcing the Sandler-Duran Agreement because Duran is famous and they have a constitutional right to make a movie based on his life story. Defendant responds that there is no governmental action because the

---

[1] Although the Sandler-Duran Agreement is physically outside of the Complaint, the Complaint incorporates it by reference, thereby making it an appropriate subject of a motion to dismiss. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (citation omitted) (stating that courts must consider the documents that the complaint incorporates by reference when ruling on a 12(b)(6) motion to dismiss); *Phillips v. LCI Intern., Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) (stating that courts may consider documents external to the complaint when ruling on a 12(b)(6) motion to dismiss where they are integral to, and explicitly relied on in, the complaint).

dispute is between private parties. Although jurisdiction does not depend on this question, the Court answers it because it is dispositive of Plaintiffs' substantive First Amendment argument.

It is well-established that "[t]he Constitution's protections of individual liberty and equal protection apply in general only to action by the government." *See, e.g.*, *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 619 (1991) (citing *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988)). Thus, "[i]n our constitutional scheme, [the] state action doctrine protects the private sector from the restrictions imposed on the conduct of government." *Andrews v. Fed. Home Loan Bank of Atlanta*, 998 F.2d 214, 216 (4th Cir. 1993). However, "[i]n certain circumstances, a private actor can still be bound by constitutional limitations because its conduct is fairly attributable to the state." *Id.* at 217 (citation and internal quotation marks omitted). "In order to show state action by a private entity, . . . it must be demonstrated that the private party charged with the deprivation could be described in all fairness as a state actor." *Id.* (citation and internal quotation marks omitted). One can deem a private party a governmental actor in four contexts, one of which is relevant here. *See id.* This occurs "when the state has committed an unconstitutional act in the course of enforcing a right of a private citizen." *Id.*

"Court enforcement of private agreements may constitute state action." *USA Techs. Inc. v. Tirpak*, Civil Action No. 12–2399, 2012 WL 1889157, at *8 (E.D. Pa. May 24, 2012) (citing *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 204 (3d Cir. 2012)); *see also Shelly v. Kraemer*, 334 U.S. 1, 19–20 (1948). Although court enforcement of state law doctrines in a manner alleged to violate the First Amendment may constitute governmental action, a court's adverse enforcement of contractual obligations that a party explicitly assumes does not constitute governmental action. *See Cohen v. Cowles Media Co.*, 501 U.S. 663, 668 (1991). Courts determine whether a party has explicitly assumed contractual obligations in

derogation of a putative First Amendment defense in light of all the relevant circumstances. *See Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 342 (4th Cir. 2000) (citation omitted); *see also Blum v. Yaretsky*, 457 U.S. 991, 1005 (1982) ("[T]he factual setting of each case will be significant . . . .").

In this case, enforcement of the Sandler-Duran Agreement would not amount to governmental action. Although the Agreement restricts Duran's publicity rights, Duran explicitly assumed this obligation in the Agreement. Section 5 generally grants Sandler the rights to Duran's name, image, likeness, and life story. Section 5 specifies that "Duran **expressly** gives to Sandler the rights to Duran's **life story** and understands that Duran's life story may be documented in book, **movie** and/or television forms." Doc. No. 7-6 § 5, at 3 (emphasis added). Thus, the Agreement's literal language compels the conclusion that Duran explicitly assumed the obligation of releasing his movie rights Sandler. Furthermore, as assignees of Duran's purported movie rights, Plaintiffs stand in Duran's shoes and have no greater rights than Duran possessed. *See James v. Goldberg*, 261 A.2d 753, 757 (Md. 1970); *accord In re Bogdan*, 414 F.3d 507, 514 (4th Cir. 2005) (citations omitted). Accordingly, enforcing the Agreement would not implicate Plaintiffs' First Amendment rights.

Plaintiffs' primary counterargument seems to be that court enforcement of private agreements affecting a third party's constitutional rights may constitute governmental action. This principle, having been recognized since *Shelly*, is not in dispute. As spelled out above, the real inquiry is whether Plaintiffs explicitly assumed the obligation whose judicial enforcement they characterize as governmental action. Plaintiffs' own allegations and documents impel the inference that they did, and any contrary conclusion would lack facial plausibility.

Plaintiffs also contend that the Agreement does not give Sandler Duran's "exclusive" movie rights. Therefore, Plaintiffs reason, Duran still had movie rights to transfer to Plaintiffs. Essentially, then, Plaintiffs conclude that they have a cognizable First Amendment interest in making their movie. This argument conflates the standards governing contract dispute claims with those governing First Amendment claims. Viewing their allegations in the most favorable light, the Court accepts that Plaintiffs have stated a facially plausible claim that Duran did not assign all of his movie rights to Sandler. This conclusion, however, does not alter the Court's analysis of the First Amendment issue. The *Cohen* Court focused on whether the court action created "obligations never explicitly assumed by the parties." 501 U.S. at 668. Here, based on the Agreement's literal language, it is clear that Plaintiffs explicitly assumed the obligation to release at least some of Duran's movie rights. Therefore, one could not plausibly infer that enforcing the Agreement, even if only to the extent of Sandler's rights, would infringe Plaintiffs' First Amendment interests.[2]

It is somewhat unclear whether Plaintiffs are arguing that they have superior and/or exclusive rights to make a movie about Duran because, allegedly, they purchased their purported interest in the same without notice of the Sandler-Duran Agreement. The salient flaw in this

---

[2] The Court's reading of *Cohen*'s "obligations never explicitly assumed" reservation is consistent with courts' construction of the same. *See, e.g.*, *Yoder v. Univ. of Louisville*, No. 12–5354, 2013 WL 1976515, at *8 (6th Cir. May 15, 2013) (construing *Cohen* for the proposition that "a party's voluntary promise to keep information confidential constituted a valid waiver of its First Amendment rights, even in the absence of an enforceable contract"); *C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818, 820–21, 823 (8th Cir. 2007) (concluding that plaintiff did not explicitly assume obligation of not infringing publicity rights because it did not license away any such rights); *United Egg Producers v. Standard Brands, Inc.*, 44 F.3d 940, 943 (11th Cir. 1995) (citing cases) ("[W]here a court acts to enforce the right of a private party which is permitted but not compelled by law, there is no state action for constitutional purposes in the absence of a finding that constitutionally impermissible discrimination is involved."); *Tirpak*, 2012 WL 1889157, at *3–5, *13 (preliminarily enjoining party from violating non-disparagement provision of agreement that explicitly placed obligation of non-disparagement on party); *see also Dem. Nat'l Comm.*, 673 F.3d at 204 (suggesting that court enforcement of consent decree between private parties does not constitute governmental action).

argument is that this case does not involve the purchase of an interest in real property and, therefore, the bona fide purchaser rule is inapplicable. *See generally* Md. Code Ann., Real Prop. § 3-203; *see also Howard Chertkof & Co., Inc. v. Gimbel*, 849 A.2d 1036, 1049 (Md. Ct. Spec. App. 2004) (emphasis added) ("It is well settled that one who purchases **real property** without notice of prior equities is protected as a bona fide purchaser for value."). Rather, the applicable rule is that "[a]n unqualified assignment . . . does not confer upon the assignee any greater right than the right possessed by the assignor." *Goldberg*, 261 A.2d at 757; *see also* Restatement (Second) of Contracts § 342 (stating that "the right of an assignee is [generally] superior to that of a subsequent assignee of the same right from the same assignor"). Therefore, the fact that Duran purported to sell his movie rights to Plaintiffs after he did so to Sandler does not give Plaintiffs a superior claim to those rights.[3]

For these reasons, this case does not implicate the First Amendment. Rather, the case boils down to a contract dispute. Permitting Plaintiffs to convert this contract dispute into a First Amendment case evokes the admonition that, if "every private right were transformed into governmental action by the mere fact of court enforcement of it, the distinction between private and governmental action would be obliterated." *Naoko Ohno v. Yuko Yasuma*, 723 F.3d 984, 1000 (9th Cir. 2013) (citation and internal quotation marks omitted). Accordingly, the Court dismisses Plaintiffs' claim that enforcing the Agreement would violate their First Amendment rights for want of governmental action.

**B.    Res Judicata**

Defendant argues that res judicata bars Plaintiffs' claim that the Agreement does not stop them from making the movie. Defendant asserts that the validity and enforceability of the

---

[3] It does not appear that Plaintiffs are arguing that they are not successors-in-interest to Duran. Plaintiffs could not make this argument in light of the Complaint and incorporated contracts, in which they basically admit that they are purported successors-in-interest to Duran. *See* Doc. No. 1 ¶¶ 12–27.

Agreement was determined in the 1996–1997 state court lawsuit. Plaintiffs respond that Defendant has not satisfied the elements of res judicata. Plaintiffs also make an undeveloped due process argument.[4]

"Under Maryland law, claim preclusion has three elements: (1) the parties in the present litigation are the same or in privity with the parties to the earlier litigation; (2) the claim presented in the current action is identical to that determined or that which could have been determined in prior litigation; and (3) there was a final judgment on the merits in the prior litigation." *Jones v. HSBC Bank USA, N.A.*, 444 Fed. App'x 640, 643–44 (4th Cir. 2011) (citation and internal quotation marks omitted).

Under Maryland law, not all claims raised in a subsequent suit that arise out of the same transaction or series of transactions at issue in a prior suit are barred. *See Rowland v. Harrison*, 577 A.2d 51, 57 (Md. 1990). In *Rowland*, the Court of Appeals of Maryland held that "where the same facts may be asserted as either a defense or a counterclaim, and the issue raised by the defense is not litigated and determined so as to be precluded by collateral estoppel, the defendant in the previous action is not barred by res judicata from subsequently maintaining an action on the counterclaim." *Id.* In reaching this conclusion, the Maryland Court of Appeals relied on, and expressly adopted the test set forth in, section 22 of the Restatement (Second) of Judgments. Section 22 has an exception to its general rule that res judicata does not bar the defendant in the prior action from later suing on the counterclaim where the same facts could have been asserted as either a defense or counterclaim in the prior action but were not. Pertinently, section 22(2) states,

---

[4] Federal courts "refer to the preclusion law of the State in which judgment was rendered" to determine its preclusive effect. *In re Genesys Data Techs., Inc.*, 204 F.3d 124, 127 (4th Cir. 2000) (citation and internal quotation marks omitted). Here, the judgment was entered in Maryland.

> A defendant who may interpose a claim as a counterclaim in an action but fails to
> do so is precluded . . . from maintaining an action on the claim if . . . [t]he
> relationship between the counterclaim and the plaintiff's claim is such that
> successful prosecution of the second action would nullify the initial judgment or
> would impair rights established in the initial action.

*Rowland*, 577 A.2d at 55 (quoting Restatement (Second) of Judgments § 22(2), (b)).

The Maryland Court of Appeals does not appear to have taken a liberal approach to its construction of section 22(2)(b). For instance, although the Maryland Court of Appeals has held in the foreclosure context that a plaintiff's subsequent claim was res judicata, it reasoned that the allegations in the second suit negated and contradicted an essential foundation of the foreclosure judgment. *See Fairfax Sav., F.S.B. v. Kris Jen Ltd. P'ship*, 655 A.2d 1265, 1280 (Md. 1995); *see also Moore v. Nissan Motor Acceptance Corp.*, 831 A.2d 12, 17 (Md. 2003).

In this case, it is premature to resolve Defendant's res judicata argument. Although Defendant asserts that Duran, as predecessor-in-interest to Plaintiffs, could have asserted his claims as defenses in the prior suit, neither Party discusses the applicability of *Rowland*. Likewise, if *Rowland* applied, one would still have to consider the effect of section 22(b). One cannot adequately do so because Defendant has adduced only a bare-bones default judgment and purportedly corresponding complaint from the state court suit. Given this evidentiary gap, one cannot sufficiently consider (1) whether Duran could have asserted the at-issue claims in the prior proceeding and, if so, (2) whether reasserting them here would nullify the prior judgment. For these reasons, the Court denies Defendant's Motion to Dismiss as to its res judicata argument. This disposition does not prejudice the right of Defendant to raise this argument on summary judgment.

**C.**     **Whether the Agreement Validly Conveyed "Publicity Rights" to Defendant**

   *1.*     *Choice of Law*

"A federal court sitting in diversity must apply the choice-of-law rules from the forum state." *Wells v. Liddy*, 186 F.3d 505, 521 (4th Cir. 1999) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941)). Under Maryland law, it is "'generally accepted that the parties to a contract may agree as to the law which will govern their transaction, even as to issues going to the validity of the contract.'" *Nat'l Glass, Inc. v. J.C. Penney Props., Inc.*, 650 A.2d 246, 248 (Md. 1994) (quoting *Kronovet v. Lipchin*, 415 A.2d 1096, 1104 (Md. 1980)). In other words, Maryland law recognizes "the ability of contracting parties to specify in their contract that the laws of a particular state will apply in any dispute over the validity, construction, or enforceability of the contract, and thereby trump the conflict of law rules that otherwise would be applied." *Kunda v. C.R. Bard, Inc.*, 671 F.3d 464, 469 (4th Cir. 2011) (citation and internal quotation marks omitted); *see also Vanderhoof-Forschner v. McSweegan*, Nos. 99-1615, 99-1616, 2000 WL 627644, at *2 n.3 (4th Cir. May 16, 2000) (citation omitted) (stating that courts typically need not inquire into the validity of choice-of-law provisions where "the parties agree that Maryland law governs their claims").

In this case, the Sandler-Duran Agreement contains a choice-of-law clause requiring "[a]ll disputes hereunder [to] be decided in accordance with the laws of the State of Maryland . . . ." Doc. No. 7-6 § 19, at 7. Neither Party has disputed the validity or applicability of this provision. Therefore, unless otherwise noted, the Court applies Maryland law to disputes regarding the interpretation and enforceability of the Sandler-Duran Agreement.

2.      *Discussion*

Defendant argues that the Sandler-Duran Agreement validly conveyed "publicity rights" to him. Plaintiffs respond that Maryland has not recognized a right to publicity.

The Court sees the issues somewhat differently than as set forth by the Parties. The Parties suggest that one must find a right of publicity (or a related right) at common law to conclude that the Sandler-Duran Agreement prevents Plaintiffs from making Hands of Stone. This suggestion stems from Section 5 of the Agreement, which generally gives Sandler the rights to Duran's name, image, likeness, and life story in a variety of media. However, concluding that the Agreement validly gives Sandler Duran's movie rights does not require the Court to determine that the right to publicity, or a related right, exists at Maryland common law. Generally speaking, private parties have the right to enter into contracts that create benefits or burdens that do not exist in the decisional or positive law and allocate them among the parties thereto as they see fit. *See generally* U.S. Const. art. I, § 10, cl. 1 ("No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."); U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to . . . the people.");[5] 42 U.S.C. § 1981 ("All persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ."); *Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213, 346–47 (1827) (opinion of Trimble, J.) ("[I]ndividuals do not derive from government their right to contract, but bring that right with them into society; that obligation is not conferred on contracts by positive law, but is intrinsic, and is conferred by the act of the parties."). In other words, "[u]nder the principles of freedom of contract, parties have a broad right to construct the terms of contracts they enter into as they wish, providing the contract is

---

[5] It is unsettled whether private individuals have standing to assert Tenth Amendment claims. *Kennedy v. Allera*, 612 F.3d 261, 269–70 & n.3 (4th Cir. 2010) (collecting cases).

neither illegal nor contrary to public policy." *Willard Packaging Co., Inc. v. Javier*, 899 A.2d 940, 947 (Md. Ct. Spec. App. 2006); *see also Lake James Cmty. Volunteer Fire Dep't, Inc. v. Burke County, N.C.*, 149 F.3d 277, 280 (4th Cir. 1998) (citations omitted); *Wolf v. Ford*, 644 A.2d 522, 525 (Md. 1994) (citation omitted); *Md.-Nat'l Capital Park and Planning Comm'n v. Wash. Nat'l Arena*, 386 A.2d 1216, 1229 (Md. 1978).

The fact that a contract creates rights and/or obligations that the common law has yet to recognize does not render it illegal or contrary to public policy. Were this rule to govern, it would unleash socioeconomic upheaval considering the centrality of contracts to modern life and the seemingly infinite number of rights and/or obligations that parties could create through them. Besides, Maryland has recognized the tort of misappropriation, which makes actionable the unlawful appropriation of "a person's name or likeness." *Lawrence v. A.S. Abell Co.*, 475 A.2d 448, 451 (Md. 1984) (citation omitted); *see also Household Fin. Corp. v. Bridge*, 250 A.2d 878, 882–83 (Md. 1969).

In view of this authority, the question is not whether the Agreement could convey publicity rights in the absence of a common law cause of action for the same. Rather, assuming the Agreement is otherwise valid, the question is whether the Court's enforcement of the rights and burdens that it creates and allocates between the parties would be illegal or contrary to public policy. Other than the idea that the Agreement violates the First Amendment, Plaintiffs present no such argument. Nor does it appear that such an argument would hold water. Therefore, although Maryland recognizes the tort of misappropriation, the Court need not consider whether the infringement of "publicity rights" is actionable under Maryland common law. In short, this is primarily a contract rights' case.

**D.      Whether the Agreement Gave Defendant "Exclusive" Movie Rights**

Plaintiffs argue that the movie rights that the Agreement gives Defendant are nonexclusive. Plaintiffs base this argument on, in their view, the plain language of the Agreement. The first sentence of Section 5 generally grants Defendant "the exclusive right" to use Duran's name, image, and likeness for any purpose. Doc. No. 7-6 § 5, at 2–3. By contrast, the third sentence of Section 5 gives Defendant "the rights" to Duran's life story. *Id.* According to Plaintiffs, the fact that the word "exclusive" qualifies Duran's right to Defendant's name, image, and likeness but not the right to Duran's life story shows that Duran did not intend to give Defendant exclusive rights to his life story. Defendant responds that the grant of Duran's name, image, and likeness subsumes his life story. Defendant also notes that the Agreement contains a noncompete clause prohibiting Duran from entering into any competing agreements without Defendant's approval. Defendant concludes that the noncompete clause shows that the parties meant to grant Defendant exclusive rights to Duran's life story.

The ordinary principles of contractual interpretation in Maryland are well-established. The Court of Appeals of Maryland has "long adhered to the objective theory of contract interpretation." *Myers v. Kayhoe*, 892 A.2d 520, 526 (Md. 2006) (citing *Traylor v. Grafton*, 332 A.2d 651, 675 (1975)). "'A court construing an agreement under [the objective theory] must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Id.* (quoting *Dennis v. Fire & Police Emps. Ret. Sys.*, 890 A.2d 737, 747 (2006)). "'[W]hen the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed.'" *Id.* (quoting *Dennis*, 890 A.2d at 747). In other words, "[a] court will presume that the parties meant what they stated in an unambiguous contract, without

regard to what the parties to the contract personally thought it meant or intended it to mean." *Maslow v. Vanguri*, 896 A.2d 408, 420 (Md. Ct. Spec. App. 2006) (citations omitted).

"'Only when the language of the contract is ambiguous will [courts] look to extraneous sources for the contract's meaning.'" *Ubom v. Suntrust Bank*, 17 A.3d 168, 173 (Md. Ct. Spec. App. 2011) (citation and internal quotation marks omitted). "Ambiguity will be found if, to a reasonable person, the language used is susceptible to more than one meaning, or it is of a doubtful meaning." *Id.* (citation omitted). "To determine whether a contract is susceptible to more than one meaning, the court considers 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of the execution.'" *Id.* (quoting *Phoenix Servs. Ltd. P'ship v. Johns Hopkins Hosp.*, 892 A.2d 1185, 1223 (Md. 2006)).

In this case, although Defendant's arguments are not without force, the Court believes that the Agreement is facially ambiguous. Given the breadth of Section 5, a reasonable person could conclude that Duran intended to transfer his movie rights to Defendant exclusively. On its face, the language name, image, and likeness could subsume someone's life story because depicting someone's life story presumably entails using the person's name, image, and/or likeness. Furthermore, Section 5 states that "Duran will cooperate with Sandler to create Duran's life story," and the Agreement contains a noncompete clause precluding Duran from entering into competing agreements without Sandler's prior approval. These terms may suggest that Duran did not envision anyone else creating his life story. Arguably, then, it would have made little sense for the parties to grant Defendant just some of the rights to Duran's life story.

Nonetheless, one could plausibly infer that the language name, image, and likeness does not encompass Duran's life story. For instance, one could conceivably argue that concluding that Duran gave Sandler exclusive rights to his life story would render the word "exclusive"

superfluous. *Cf. State Highway Admin. v. David Bramble, Inc.*, 717 A.2d 943, 948 (Md. 1998) (citation omitted) ("[T]his Court will ordinarily avoid interpreting contracts in a way that renders its provisions superfluous . . . ."). Furthermore, expounding Texas law, the Fifth Circuit has held that "[t]he protection of name or likeness . . . does not include a person's life story." *Matthews v. Wozencraft*, 15 F.3d 432, 437 (5th Cir. 1994) (internal quotation marks omitted). And, while the Agreement contains other terms (e.g., the noncompete clause) that may compel a contrary conclusion, the Parties have not adequately briefed the significance of these terms.

The Agreement's facial ambiguity empowers the Court to look to external sources for clues as to its meaning. However, the Court is ruling on a Motion to Dismiss, and the Parties have yet to submit any such evidence. Therefore, construing Plaintiffs' Complaint in the most favorable light, Plaintiffs deserve the benefit of discovery regarding whether Duran gave Sandler exclusive rights to his life story.

**E.      Whether the Agreement Is Unconscionable**

Plaintiffs plead that the Agreement is unconscionable. This argument begins with two terms of the Agreement. Section 15 provides that Sandler may terminate the Agreement and retain all rights under it if Duran breaches it. Doc. No. 7-6 § 15, at 6. For its part, Section 13 provides that the agreement runs for successive five-year terms unless Sandler gives Duran notice of termination. *Id.* § 13, at 6. Based on these provisions, as well as the state court judgment against Duran, Defendant asserts that he still has exclusive rights to Duran's life story. Plaintiffs maintain that "[i]t would misread the Agreement, and lead to an unconscionable . . . result to construe the Agreement to permit Sandler to enjoy an exclusive right to the Duran's life story – even for projects not undertaken for 18 years after termination of the Agreement – in perpetuity." Doc. No. 10 at 28. Although Defendant argued that the Agreement is not

unconscionable in his Motion to Dismiss, Plaintiffs advance no further arguments for their contention that the Agreement is unconscionable.

The Court disagrees that the Agreement is unconscionable. Plaintiffs do not respond to Defendant's arguments that the Agreement is not unconscionable. Plaintiffs neither cite authority to oppose this argument nor argue from fact. These oversights, in effect, amount to a concession that the Agreement is not unconscionable. *See Hawkins v. Leggett*, --- F. Supp. 2d ----, Civil Action No. 12–cv–00623 AW, 2013 WL 3218964, at *25 n.3 (D. Md. June 24, 2013) (citation omitted); *Ferdinand–Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) (citation omitted). Furthermore, even were the Court to reach the merits of the question, it would conclude as a matter of law that the Agreement is not unconscionable. Under Maryland law, "[a]n unconscionable contract involves extreme unfairness, made evident by (1) one party's lack of meaningful choice, and (2) contractual terms that unreasonably favor the other party." *Barrie Sch. v. Patch*, 933 A.2d 382, 394 (Md. 2007) (citation and internal quotation marks omitted). Here, the Complaint and incorporated contracts leave no indicia of "extreme unfairness" in the Agreement. Defendant asserts, and Plaintiffs have yet to dispute, that Defendant paid Duran at least $60,000 in connection with the Agreement. Moreover, the Agreement requires Defendant to engage in revenue-generating activities as Duran's manager. *See* Doc. No. 7-6 § 4, at 2. Additionally, given the nature of the Agreement and Duran's status as a famous boxer, it defies good sense to infer that he lacked a meaningful choice in terms of whether to enter into the Agreement. Accordingly, as a matter of law, the Agreement is not unconscionable.[6]

---

[6] Plaintiff pleads that the Agreement is an illegal contract of adhesion. The Court's determination that the Agreement is not unconscionable forecloses the possibility that the Agreement could be an unenforceable contract of adhesion. *See Patch*, 933 A.2d at 394 (citation omitted) (noting that a contract of adhesion is unenforceable only if it is unconscionable).

## F.      Void for Vagueness

Plaintiffs also plead that the Agreement is void for vagueness. The Court disagrees with this argument as well. Plaintiffs do not respond to Defendant's dispositive arguments against this claim. Therefore, as with their unconscionability claim, Plaintiffs have essentially acknowledged that this claim is not viable. *See* Part III.E, *supra*. Furthermore, the Court rejects this claim on the merits. Under Maryland law, courts generally declare a contract void for vagueness only where it is "unintelligible or insensible." *See Coe v. Hays*, 614 A.2d 576, 580 (Md. 1992) (citation and internal quotation marks omitted). This does not occur where, as here, the agreement's "meaning . . . can be ascertained, either from the express terms of the instrument or by fair implication." *Id.* (citation and internal quotation marks omitted). Accordingly, the Court concludes as a matter of law that the Agreement is not void for vagueness.

## G.      Preliminary and Permanent Injunctive Relief

Defendant seeks the dismissal of Count II of Plaintiffs' Complaint, through which Plaintiffs seek preliminary and permanent injunctive relief. The Court dismisses Count II for the following reasons.

"[I]njunctive relief [i]s an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968 (1997) (per curiam)). Accordingly, a plaintiff must establish each the following four factors to obtain a preliminary injunction: "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009) (quoting *Winter*, 555 U.S. at 20), *vacated on other grounds*, 130 S. Ct. 2371 (2010).

In this case, one could not plausibly infer the satisfaction of the first or second elements of this test. As for element (1), Plaintiffs have not shown a likelihood of success on the merits. The Court has dismissed the vast bulk of Plaintiffs' claims, including their key First Amendment claim. Furthermore, although the Parties did not brief this question, it is conceivable that Plaintiffs, as successors-in-interest to Duran, waived their right to pursue a First Amendment claim by executing the Agreement. *Cf. Snepp v. U.S.*, 444 U.S. 507, 510 n.3 (1980) (holding that party waived First Amendment rights by voluntarily signing agreement requiring him to obtain preclearance before publishing certain information about the CIA); *Curtis Publ'n Co. v. Butts*, 388 U.S. 130, 145 (1967) (stating that waivers of First Amendment rights must be "clear and compelling"); *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) ("A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege."); *Tirpak*, 2012 WL 1889157, at *10–12 (assuming arguendo party had First Amendment right and holding that party waived it by executing agreement explicitly placing on party obligation of non-disparagement).[7] Additionally, although the Court left Plaintiffs' contract dispute claim in the suit, the Court noted that Defendant's arguments thereagainst did not lack force. Thus, Plaintiffs have not shown a likelihood of success on the merits.

Even if Plaintiffs could show a likelihood of success on the merits, one could not plausibly infer that Plaintiffs would be likely to suffer irreparable harm in the absence of preliminary injunctive relief. Although this is a declaratory judgment action, the thrust of Plaintiffs' Complaint is that they will incur economic harm if Defendant asserts his rights under the Agreement. For instance, Plaintiffs allege as follows: (1) the amount in controversy exceeds $ 75,000; (2) certain Plaintiffs paid hundreds of thousands of dollars for the rights to make a

---

[7] If the case proceeds to summary judgment, the Court will entertain argument on whether Plaintiffs, as purported successors-in-interest to Duran, waived the right to pursue a First Amendment claim by signing the Sandler-Duran Agreement.

movie about Duran; and (3) Plaintiffs have incurred "millions of dollars in production costs." *See* Doc. No. 1 ¶¶ 7, 26, 28, 47. Where, as here, "the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) (citations omitted); *see also Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2748 (2010) (emphasis added) (stating that irreparable harm is present only where "remedies available at law, such as **monetary damages**, are inadequate to compensate for that injury"); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (citation omitted) ("Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business."). Plaintiffs' allegations do not support a plausible inference that they will lose their livelihood in the absence of preliminary injunctive relief. Indeed, in responding to Defendant's argument that Plaintiffs have inadequately pleaded irreparable harm, Plaintiffs assert only that the "deprivation of a First Amendment right constitutes irreparable harm." Doc. No. 10 at 34 (citation and internal quotation marks omitted). Although this is a correct legal statement, *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011), the Court has dismissed Plaintiffs' First Amendment claim. Accordingly, Plaintiffs have not sufficiently stated a claim under prong two.[8]

Nor have Plaintiffs stated a cognizable claim for permanent injunctive relief. If Plaintiffs cannot state a claim for preliminary injunctive relief, it follows a fortiori that they cannot state a claim for permanent injunctive relief.[9]

---

[8] As plaintiffs must establish each of the four foregoing factors to obtain a preliminary injunction, the Court need not consider the third and fourth elements.

[9] Plaintiffs seek a declaration that Defendant would not be able to state a claim for tortious interference with contract. The Court has reviewed the Parties' pleadings and memoranda carefully and concludes that it is plausible that Defendant could state a claim against one or more Plaintiffs for tortious interference with the Sandler-Duran Agreement. *See generally Hugh v. E Tech Holdings, Inc.*, Civil Action No. 8:13–

**IV.    CONCLUSION**

In light of the preceding considerations, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion to Dismiss. A separate Order memorializing the Court's rulings follows. The Court will issue a Scheduling Order.

| | |
|---|---|
| September 26, 2013 | /s/ |
| Date | Alexander Williams, Jr. |
| | United States District Judge |

---

cv–01197–AW, 2013 WL 4543402, at *2 (D. Md. Aug. 26, 2013) (citations omitted) (discussing the elements for intentional interference with contract).